RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
ALLIE WILSON
Assistant Federal Public Defender
New York State Bar No. 5479597
200 S. Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451/Tel.
(702) 388-6261/Fax
Allie_Wilson@fd.org

Attorney for JUDY FRAIZE

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JUDY FRAIZE,<br><br>　　　　　Defendant. | Case No. 1:24-cr-00267-ACR<br><br>**Judy Fraize's Sentencing Memorandum** |

Judy Fraize, by and through her counsel of record, Allie Wilson, Assistant Federal Public Defender, hereby submits this sentencing memorandum to assist the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to meet the sentencing goals outlined under 18 U.S.C. § 3553(a). The defense requests a sentence of one year of probation and, in lieu of a fine, a condition requiring her to complete 80 hours of community service.

## 1. Ms. Fraize's History and Characteristics

Ms. Fraize has been a caregiver for most of her life, ever since her son was born in 1986. She spent the first ten years of his life as a stay-at-home mom. PSR

¶ 74. After her divorce, around 1995, she was a struggling single mother. PSR ¶ 47. She received only $400 in child support from her son's father and otherwise had to make ends meet alone. For her first year as a single mother, in 1995, she earned only $7 an hour as a meter inspector for the public water company in Crystal Beach, TX. PSR ¶ 73. She then began pursuing a career in real estate. PSR ¶ 72.

The year her son reached adulthood, in 2004, she became responsible for caring for her aging mother and stepfather. PSR ¶ 71. She moved in with them, as they were no longer able to care for themselves. *Id.* ¶ 43. She has only sporadically worked since then, as her caretaking responsibilities have been a full-time job. *Id.* ¶ 71. Her stepfather developed dementia and Alzheimer's disease. *Id.* By 2014, his disease had progressed to the point that he was acting erratically, sometimes violently, sometimes wandering off. PSR ¶ 43. She arranged for him to reside at a nursing home while she remained in the family home with her mother. *Id.*

She continued to care full-time for her mother until her mother's needs also became too much for her. Her mother became a fall risk and was too heavy for her to lift in emergencies. PSR ¶ 38. She arranged for her mother to enter the St. James House nursing home in January 2020. A month later, in February 2020, her stepfather passed away.

Ms. Fraize spent most of 2020 grieving the loss of her stepfather and her own inability to care for her mother herself in their home. She was unable to visit her mother because of Covid-related restrictions. But, in early 2022, Ms. Fraize took in another aging family member—her aunt, Gloria Bergeron. Ms. Bergeron is 95 years

old and suffers from advanced lung and heart disease and dementia. *See* Exhibit A (Letter from Dr. Lorenzo Bortolotti). Ms. Bergeron previously lived with her own daughter, who was the last living member of her immediate family. *See* Exhibit B (Letter from Gloria Bergeron). In 2022, Ms. Bergeron's daughter was hospitalized, and, a few weeks later, her daughter passed away. *Id*. She reports that "[she] had nowhere to go" but, when she spoke to Ms. Fraize, Ms. Fraize invited her to live in her home. *Id*. Ms. Fraize takes care of all of Ms. Bergeron's daily needs. *Id*. She cooks; she cleans; she helps with medication, bathing, and transport too and from weekly medical appointments. *Id.* Ms. Bergeron's doctor reports that "Ms. Bergeron relies on her niece for all care and is unable to be by herself without her niece's assistance." *See* Ex. A. Ms. Bergeron reports, "I do not know what I would do without her" and describes her as "a godsend for me." Ex. B.

Now, Ms. Fraize splits her time between caring for her Aunt Gloria and visiting her mother. She ensured that her mother moved into a nursing home that was nearby so that she can visit often. The St. James House nursing home where her mother resides is only ten minutes away, and she visits almost daily. Her Aunt Gloria applauds Ms. Fraize for ensuring that her mother was in "a good nursing home" and visiting often "to make sure she is being taken care of properly." Ex. B. She states, "[e]verybody at the nursing home knows Judy because she is there so often."

Ms. Fraize's mother is unfortunately too disabled to share her appreciation for Ms. Fraize's efforts, but Ms. Bergeron shares her own sentiments: "Ms. Fraize is kind to everybody, and everybody loves her for it." Ex. B.

**2. The Offense Conduct**

Ms. Fraize traveled to Washington D.C. in January 2021 with the purpose of supporting her candidate. She has (and had) no extremist ties and, unlike some others who participated in the January 6 riot, had no preconceived plan to commit a criminal act during her trip.

She had attended prior rallies before the November 2020 election and believed that a rally in the nation's capital would be similar. She had struggled with loneliness during the pandemic in 2020 after her stepfather passed away and her mother moved into a nursing home. Her Aunt Gloria had not yet moved in, and, for the first time in decades, she lived alone in the family home and was not responsible for providing full-time care to others. She decided to take advantage of her lessened responsibilities to take a road trip to Washington D.C. to attend the now-infamous January 6 rally.

On the day of the rally, Ms. Fraize made the unfortunate decision to enter the U.S. Capitol without authority. She acknowledges that her decision was wrong and that she became part of a crowd that, as a whole, endangered the lives of civilians and law enforcement alike, destroyed property, and disrupted Congress. Ms. Fraize, however, never personally used or threatened force nor did she personally cause any damage to property. While her presence itself was wrong and

4

disruptive, her demeanor (as depicted in surveillance and body worn camera footage) was calm and respectful.[1]

Ms. Fraize was in the Capitol for approximately thirty-seven minutes. *See* ECF 22 at 4. She entered as part of a crowd through the Upper West Terrace door at 2:39 PM, approximately forty minutes after the first rioters breached the Capitol's barricades. *Id.* at 4-5. Four officers were standing by the entrance when she entered, but, by the time Ms. Fraize entered, none appeared to be making any attempts to stop anybody from entering. Ms. Fraize did not physically force entry, and it appears that she did not directly disobey orders from law enforcement upon entry.

Ms. Fraize briefly passed through the Rotunda before walking to an area outside of the House Chambers. *See* ECF 22 at 4. According to Ms. Fraize, she briefly joined a crowd of demonstrators outside of the House Chambers, but, when she realized that her presence was inappropriate, she immediately returned to the Rotunda. This is supported by surveillance video, which shows her walking through Statuary Hall towards the House Chambers at approximately 2:42 PM and away from the House Chambers only four minutes later, at approximately 2:46 PM. Surveillance video from the area immediately outside of the House Chambers shows

---

[1] Any reference to facts not contained in the Statement of Offense (ECF 22) are derived from surveillance video and body worn camera footage provided to the defense in the discovery process. Those materials are under a protective order that restricts their use in Court filings absent either agreement from the government or permission from the Court, *see* ECF 11, and are not attached as exhibits to this Sentencing Memorandum. The defense believes none of these facts will be in dispute, but, if they are, or if the Court prefers to review those materials, the defense will confer with the government regarding the filing of those materials under seal.

her walking through the crowd while videotaping with her smartphone, but it does not show her engaging in any visibly boisterous activity.

Ms. Fraize then returned to the Rotunda, where she remained for approximately the next half hour. *See* ECF 22 at 4. On body worn camera footage, at around 3:08PM, she is seen sitting calmly, smiling, and chatting on the sidelines on one of the benches along the edge of the Rotunda. Although it is true that law enforcement asked multiple times for her to begin exiting before she stood up and joined the crowd moving towards the exit, *see* ECF 22 at 4, she appears to attempt to convey her respect for the law enforcement officers present that day when she says with a smile, audibly on body worn camera footage, "I know you have to do your job, blue lives matter, we love you anyway." She gets up immediately afterwards and begins to move with the crowd towards the exit, in compliance with orders from law enforcement. At 3:16PM, she exited the Capitol. *See* ECF 22 at 5.

Ms. Fraize reached age 70 with no criminal record. She is a quiet and timid person who endeavors not to be a burden on others. Now, with the benefit of hindsight, she calls her participation in the January 6 riot "the biggest mistake of my life." Her participation in a criminal act is uncharacteristic; yet, her quiet and respectful demeanor throughout the 37 minutes she spent in the Capitol is not.

### 3. Sentencing Recommendation

The defense requests a sentence of one year of probation. Ms. Fraize's conduct at the January 6 riot, her complete lack of criminal history, and her caretaking responsibilities for her elderly aunt, all make a custodial sentence (or

even a sentence of a term of house arrest) far "greater than necessary" to meet the sentencing goals of 18 U.S.C. § 3553(a). Ms. Fraize has perfectly complied with all conditions of pretrial release, *see* ECF 19, demonstrating her ability to comply with community supervision.

Given Ms. Fraize's long history of unpaid work in support of her family, she is not in a financial position to pay a fine on top of the $500 in restitution that she has agreed to pay as part of the plea agreement. At over 70 years old, her total net worth is barely above $10,000. PSR ¶ 79. She relies on social security income, support from an ex-husband, and contributions from Ms. Bergeron to make ends meet. *Id.*

In lieu of a fine, she seeks a condition of probation requiring her to complete 80 hours of community service. She specifically requests that the Court authorize her to complete her community service at the nursing home where her mother resides, the St. James House nursing home, under the supervision of the home's staff. Given her near-daily visits to the nursing home, her educational background in nursing, *see* PSR ¶¶ 65-66, and her long history of working with the elderly, she is well-situated to positively contribute to the home. She also will be able to volunteer at the home while in the company of her aunt, Ms. Bergeron, who struggles if left at home alone. However, as the nursing home is set up as a for-profit business, the U.S. Probation Office may not find community service hours at the home to qualify absent specific permission from the Court.

### 4. Objections to the PSR and Sentencing Recommendation

Ms. Fraize reasserts two objections to the PSR: the travel restriction and the firearm restriction. First, while Ms. Fraize has no objection to the location restriction preventing her from traveling to Washington D.C. without prior permission from U.S. Probation, she seeks a modification of the additional travel restriction preventing her from traveling outside of the Southern District of Texas without prior permission from her probation officer. At the very least, she seeks the ability to travel throughout the entire state of Texas without prior approval to ensure that she is able to visit friends and family outside of the Southern District. The Southern District of Texas is a creation of the federal court system, the boundaries of which Ms. Fraize is unfamiliar. Houston, where Ms. Fraize lives, sits at the northernmost corner of the district, and it would not be unusual for Ms. Fraize to find herself outside of the district. The condition, as written, is unnecessarily burdensome.

Second, Ms. Fraize objects to the recommended condition that she surrender all firearms for the duration of her term of probation. 18 U.S.C. § 3563(a) only allows the Court to impose discretionary conditions such as the firearm restriction "to the extent that such conditions involve only such deprivation of liberty or property as are reasonably necessary" to accomplish the goals of 18 U.S.C. § 3553(a)(2). As relevant here with respect to the firearm prohibition, § 3553(a)(2) requires the Court to craft a sentence that "afford[s] adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant."

Here, Ms. Fraize has no criminal record that would prohibit her from possessing firearms. There are no indicators in her past of any violent tendencies, including with respect to the instant offense during which she did not so much as threaten the use of force, let alone violent force. The firearm prohibition, therefore, is not a "reasonably necessary" "deprivation of…property." 18 U.S.C. § 3563(a).

When it comes to a condition such as the firearm prohibition that infringes on Second Amendment rights, the Court must also look to *Bruen* to determine whether the restriction passes constitutional muster. *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* requires a two-step analysis. *Id.* at 2129-30. First, the Court must determine whether the "plain text" of the Second Amendment clearly covers the regulated conduct. *Id.* Second, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

There is no doubt that possession of a firearm for the purposes of self-defense falls squarely within the plain text of the Second Amendment. *See United States v. Heller*, 554 U.S. 570, 634 (2008).; *Bruen*, 142 S.Ct. at 2122. Ms. Fraize is a lawful owner of two firearms that she keeps for self-defense, which is the "core protection" of the Second Amendment. *Heller*, 554 U.S. at 634. While she surrendered those two firearms to a third-party in compliance with a condition of her pretrial supervision, she has felt vulnerable as an older woman, living only with another elderly woman, without those means of self-defense.

That brings the analysis to step two. Here, the government would have to affirmatively prove that the statute that permits courts to confiscate firearms as a condition of supervision (18 USC § 3563(b)(8)) "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Given the nature of the misdemeanor convictions to which Ms. Fraize has pleaded guilty, the government will be unable to do so.

Finally, Ms. Fraize objects to the requirement in the Sentencing Recommendation filed by U.S. Probation that requires her to pay restitution within 30 days of sentencing. ECF 27 at 3. Given Ms. Fraize's financial position, it is unlikely that she will be able to pay $500 within 30 days of her sentencing. She instead requests a condition requiring her to enter an appropriate payment plan with U.S. Probation and requiring payment in full by the close of her period of probation.

**5. Conclusion**

In January 2021, Ms. Fraize made what she considers to be the biggest mistake of her life when she decided to enter the U.S. Capitol without authority. Her conduct while inside the Capitol, however, was calm and respectful. Although she was a part of a group that caused harm to people and property, she did not personally engage in any destructive behavior. And, she spent the prior seven decades of her life as a completely law-abiding citizen. She has proven herself amenable to supervision by complying with all terms of her pretrial release. A sentence of one year of probation and a condition that she complete eighty hours of

community service is appropriate to serve the sentencing goals of 18 U.S.C. § 3553(a).

DATED September 6, 2024.

                                                Respectfully submitted,

                                                RENE L. VALLADARES
                                                Federal Public Defender

                                  By:  */s/ Allie Wilson*
                                                ALLIE WILSON
                                                Assistant Federal Public Defender

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2024, I filed the foregoing document under seal using the CM/ECF System. I further served an electronic copy via email to government counsel of record pursuant to the rules of the Clerk of Court.

                                  */s/ Katrina N. Burden*
                                  Employee of the Federal Public Defender